Breitel, J.
The principal issue is whether a private proprietary hospital has an obligation to a patient and his family using its facilities to make certain that they have given an informed consent to an unusual, dangerous operation performed by their privately retained surgeon. The trial court and the Appellate Division concluded that the hospital had such an obligation, and, based on the jury’s verdict, that the obligation had been breached.
The rule has been that a hospital may be held liable in tort for permitting its facilities to be used by an unlicensed person or by a licensed person committing an act of malpractice with the knowledge of the hospital or under circumstances putting it on notice of such wrongful act. To permit recovery in this case would extend the rule to place an enlarged burden on the hospital to ascertain in the event of an unusual and dangerous operation whether an informed consent has been given and, if necessary, to verify the fact of such consent from the patient or his family. For the reasons to be discussed it is concluded that there is no traditional basis to support such an extension of the rule and that to so extend the rule would not be desirable as a matter of public policy.
Plaintiff administratrix sued for wrongful death and conscious pain and suffering. The jury returned a verdict for $42,500 on each cause of action but, under the conditions imposed by the trial court, the recovery was reduced by stipulation to $30,000 for the death cause of action and to $15,000 for conscious pain and suffering. Judgment was rendered against both the surgeon and the hospital. Both appealed and the Appellate Division affirmed unanimously as to the surgeon and affirmed by a divided court, one Justice dissenting, as to the hospital. Only the hospital has appealed to this court.
The surgeon’s liability has now been fixed and there remains only the question of the hospital’s responsibility. The changed status of the case must be kept constantly in mind, and the *412 hospital’s liability distinguished because the evidence establishing the surgeon’s responsibility is substantial and the affirmed judgment is now conclusive on that issue.
The facts are as follows. The decedent was a generally healthy, athletic, schoolboy of 14 years. He developed a moderate (38%) scoliosis or curvature of the spine. His mother took him to a physician who recommended the patient to the surgeon, Dr. Wenger, an orthopedic specialist. The surgeon recommended a drastic or radical procedure, known as a spinal-jack operation, rather than the customary protracted treatment involving spinal fusion (also a major operation) and the use of a body cast. On the trial it was a disputed issue whether the surgeon had informed the parents of the relative novelty of the spinal-jack operation, the broader details of its execution, or that it was not a procedure generally accepted in the medical community. This issue, of course, is now concluded in favor of plaintiff by the jury verdict and the affirmed judgment.
The surgeon himself had devised the spinal-jack operation and had performed it previously some 35 times. One of these had resulted in paralysis and, eventually, a death which was arguably related to the operation. Some four other operations had been followed by serious complications. The surgeon’s procedure had been constantly improved, however, based on his experience with the earlier operations. Concededly, the surgeon was the only one in this country using his technique and at the very best it was not commonly used elsewhere in the world.
The operation performed on decedent lasted 5% hours. Two inches were excised from each of seven ribs, and a similar number of bony processes were removed from the spine. The principal artery, the aorta, was detached from the spine so that it would hang freely, and evidently the same was done to the vena cava, the principal vein. Other organs were temporarily pushed aside. Holes were then drilled into vertebrae to receive two screws. The upper screw was 2:l% inches long, and the lower somewhat longer. A metal bar of about four inches in length with a turnbuckle was then attached to the screws. First by manual pressure and then by wrench applied to the turnbuckle the spine was straightened. Throughout the operation X rays were taken to verify placement and alignment of the devices. The drastic or radical nature of the operation (and it has been *413 described variously as that) is evident even from this brief statement. Further description would emphasize the gruesome character of the operation, especially, of course, to laymen. The claimed advantage of the operation is that, if successful, it is more certain of achieving the desired result and the patient is ready for normal activity after a brief period of convalescence compared with the year or longer period involved in the spinal ■ fusion and body cast procedure, the usual treatment for this condition.
The operation was performed September 11,1958. While still in the hospital, the boy developed untoward symptoms and on September 29, 1958 he died of a massive hemorrhage with external effusion of blood. There was disputed expert opinion evidence whether the blood was arterial or venous and, therefore, whether it derived from the aorta or the vena cava, the aorta having received greater manipulation during the operation. The parents refused consent to an autopsy which might have revealed the cause of the hemorrhage. No contention was ever made either by the surgeon or the hospital that the operation was required as a matter of emergency; nor would such a contention have been tenable, even if one accepts the surgeon’s disputed testimony that decedent’s scoliosis condition was deteriorating progressively.
On the evidence, the jury was entitled to find that the surgeon had never explained sufficiently to the mother the hazards of the operation, the available alternatives, or the fact that the procedure was not employed by anyone else in this country. Nor did the surgeon claim that he had advised the mother that the child might die from the surgery. Of course, he did not regard the operation as involving a greater risk of fatality than most radical major operations.*
*414 The surgeon’s liability being established, the issue is whether the hospital was guilty of any breach of duty owed by it to the patient or his parents. The hospital’s director of surgery testified that he knew the nature of the Wenger spinal-jack operation; that there had been difficulties in earlier operations but that there had been improvements by the surgeon in his techniques; that the surgeon had performed three spinal-jack operations at the hospital without untoward consequences; and that he never inquired of the surgeon to ascertain why he no longer performed the operation at the Hempstead G-eneral Hospital. Had such inquiry been made of the surgeon or of the Hempstead hospital, the inquirer would have learned, presumably, that the surgeon had been forbidden to perform any more spinal-jack operations there, as a result of the paralysis of one of his patients following a spinal-jack operation.
Where a professional person provided (employed) by the hospital commits an act of malpractice the hospital may be liable derivatively under the doctrine of respondeat superior (Bing v. Thunig, 2 N Y 2d 656, 666). But this doctrine, of course, does not apply where the malpractice is performed by a physician retained by the patient himself (ibid.; 2B Warren, Negligence [3d ed., 1966], § 1.04). Where the treatment is provided by independent physicians, the hospital, and this is especially true of private proprietary hospitals, serves the function only of. a specialized facility, not a direct service healing institution (Goldwater v. Citizens Cas. Co., 7 N. Y. S. 2d 242 [Mun. Ct.], affd. 36 N. Y. S. 2d 413 [App. Term]; Wetzel v. Omaha Maternity & Gen. Hosp. Assn., 96 Neb. 636, 643 [dis. opn.]; Hayt, Hayt and Groeschel, Law of Hospital, Physician and Patient [2d ed., 1952], p. 202).
It should be evident that a hospital generally cannot be held liable, other than derivatively, for another’s malpractice. Thus, where, as here, there is no vicarious liability, the plaintiff must establish that the hospital, through its own agents, was guilty of malpractice or other tort concurring in causing the harm. Where a hospital’s alleged misconduct involves an omission to act, the hospital will not be held responsible unless it had reason to know that it should have acted within the duty it concededly had (Martindale v. State of New York, 269 N. Y. 554; Robertson v. Towns Hosp., 178 App. Div. 285, 287-288). More particularly, *415 in the context of the present case, a hospital will not be held liable for an act of malpractice performed by an independently retained healer, unless it had reason to know that the act of malpractice would take place (see Hendrickson v. Hodkin, 276 N. Y. 252, 256, revg. 250 App. Div. 619; Schloendorff v. Society of N. Y. Hosp., 211 N. Y. 125, 134; 41 C. J. S., Hospitals, § 8, subd. c, par. [3]; Hayt, Hayt and Groeschel, op. cit. supra, p. 203). As Mr. Justice Lazan sky noted, dissenting in the Appellate Division in the Hendrickson case (supra): “ [A hospital] is not required to pass upon the efficacy of treatment; it may not decide for a doctor whether an operation is necessary, or, if one be necessary, the nature thereof; but it owes to every patient whom it admits the duty of saving him from an illegal operation or false, fraudulent or fictitious medical treatment.” (250 App. Div., p. 621.)
To be sure, Dr. Wenger stands responsible for proven acts of malpractice on this record, but not because a spinal-jack operation is per se an act of malpractice. Hence, the mere fact that the hospital knew the surgeon was to perform a spinal-jack operation does not charge it with a tort. The surgeon’s responsibility stemmed from his failure to obtain an informed consent from the boy’s parents, and perhaps for some of the incidents of the operation about which proof was made with the contention that he had been negligent. But none of these acts or omissions are chargeable to the hospital. Only if, because of the nature of the operation, the hospital was required to obtain a further consent from the patient or his parents or to verify in some other way that the surgeon had done his duty in that respect could liability attach to the hospital.
Moreover, it would not be just for a court, having the benefit of hindsight, to impose liability on a hospital for its failure to intervene in the independent physician-patient relationship. That relationship is always one of great delicacy. And it is perhaps the most delicate matter, often with fluctuating indications, from time to time with the same patient, whether a physician should advise the patient (or his family), more or less, about a proposed procedure, the gruesome details, and the available alternatives. Such a decision is particularly one calling for the exercise of medical judgment (Govin v. Hunter, 374 P. 2d 421, 423 [Wyo.]). In the exercise of that discretion, *416 involving as it does grave risks to the patient, a third party should not ordinarily meddle. (See Mills v. Society of N. Y. Hosp., 242 App. Div. 245, 253-254, affd. 270 N. Y. 594; Matter of Brown v. St. Vincent’s Hosp., 222 App. Div. 402, 404-405; Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal. App. 2d 560, 578; Natanson v. Kline, 186 Kan. 393, rehearing den. 187 Kan. 186.)
In the Salgo case (supra) (followed in Natanson v. Kline, supra), the court noted that “ [T]he physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming á patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient’s mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent.” That untoward consequences could flow from informing a patient of medical risks is amply demonstrated by the facts in Ferrara v. Galluchio (5 N Y 2d 16) in which this court affirmed a judgment inclusive of $15,000 for mental anguish suffered by the plaintiff upon whom a prior act of malpractice had been performed because she had been informed by her second physician that skin lesions induced as the result of defendant’s malpractice could become cancerous.
Moreover, and for a different reason, policy militates against imposing liability upon the hospital. For to do so would tend to discourage hospitals from permitting physicians to use their facilities to perform novel medical procedures, or would induce hospitals to discourage patients from undergoing them. (See Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal. App. 2d 560, 569, supra, where the court refused to apply the doctrine of res ipsa loquitur, in a case in which a patient was *417 paralyzed as a result of an “aortography”, because the technique was a relatively novel one.)
Nor would it be fair to impose such an unprecedented liability on a hospital in the absence of facts bringing home to the hospital that the patient was unaware of the dangers and novelty of a medical procedure, or that for medical reasons the procedure was not indicated, or that in previous instances the surgeon had failed to obtain an informed consent.
So long as it cannot be said that a spinal-jack operation is per se an act of malpractice, the hospital does not share and should not share in the responsibility to advise patients of the novelty and risks attendant on the procedure. Nor must it advise patients of the various schools of thought in the profession agreeing or disagreeing on the desirability of a proposed procedure, any more than it should on the direful choices that must be made with respect to cancer patients, novel heart surgeries, and the use of new equipment to displace temporarily the functions of the heart, circulatory systems, the kidneys and other vital organs. Nor is it desirable, as a matter of public policy, that more and more hospitals (and the better ones are more likely to do so than the inferior ones) should either close their doors to, or by interventions discourage, less conventional or even experimental operations.
Nor was the hospital on notice to inquire further of the surgeon’s experience with the Hempstead hospital. There is no dispute that the surgeon was reputable and had written at length many times in medical journals on the nature of Ms spinal-jack operation. Indeed, had the hospital been told that the Hempstead hospital had refused to permit the surgeon to perform his spinal-jack operation there, this alone would not be an indication that this hospital should not permit him to do so, or that, under the existing standards in the profession, the hospital should obtain a further consent from the patient or verify the one received by the surgeon. To be sure, the hospital would then be required to be more careful about permitting the surgeon to use its facilities but not to displace him in his professional responsibilities. Actually, the hospital had followed the surgeon’s practices with regard to spinal-jack operations and used standard hospital routines to check on the surgical procedures he had used. The hospital, however, has been held liable just *418 because it did not intervene into the patient-physician relationship.
There is some claim by plaintiff that the hospital, through its own staff, contributed to the boy’s death. These points, however, are not seriously urged as a basis of liability, but rather partake of the nature of makeweight. Moreover, the alleged negligence is not shown to have caused or in any way contributed to the boy’s death.
Assuming whatever degree of reprehensibility in the surgeon’s conduct and however drastic or radical the operation, liability does not attach to the hospital unless it knew or should have known that there was lacking an informed consent or that the operation was not permissible under existing standards.
Of course, it may be that with widespread information, not available in a single case as this one, an argument can be made for an extended rule. If so, this would seem to be a matter better for legislative handling. (See, e.g., S'. 2750, Intro. A. 4357, Print A. 4511 [1967 Session] involving “human research ”, passed in the Senate, but defeated in the Assembly.)
Accordingly, the order and judgment insofar as appealed from should be reversed and the complaint against the defendant hospital dismissed, with costs.
Chief Judge Fuld and Judges Van Voorhis, Burice, Scileppi, Bergan and Keating concur.
Order of Appellate Division and judgment of the Supreme Court reversed and the complaint against defendant Doctors Hospital dismissed, with costs in all courts.

 The record contains but one reference to any written release or waiver having been executed by decedent’s parents, either for the surgeon or the hospital. The mother executed a “Permit for Medieal/Surgical Treatment” which provided only that “I hereby give permission to Dr. Wenger to do whatever operation in his judgment may be necessary on My Son — Michael [,] also for the administration of an anesthetic.” Such a release or any more detailed release, waiver or consent in favor of the surgeon, however, would not, of course, have any bearing on the hospital’s liability, unless it contained detailed information and waiver with respect to the operation -- an unlikely iuelusiun.