Delois **ROBERSON** and James Roberson,
Plaintiffs-Appellants,

v.

**MENORAH MEDICAL CENTER,**
Defendant-Respondent.

**No. KCD 30260.**

Missouri Court of Appeals,
Western District.

Sept. 4, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1979.

Application to Transfer Denied
Nov. 14, 1979.

Elwyn L. Cady, Jr., Independence, for plaintiffs-appellants.

Robert M. Sommers and Neal E. Millert, Kansas City, for defendant-respondent.

Before DIXON, P. J., and SOMERVILLE and KENNEDY, JJ.

KENNEDY, Judge.

At the conclusion of plaintiff's evidence in an action for damages against defendant Menorah Hospital, the court sustained defendant's motion for a directed verdict. From the ensuing judgment for defendant, plaintiff has prosecuted this appeal.[1]

Finding, as did the trial court, that plaintiff's evidence failed to make a submissible case against the defendant, we affirm the judgment.

Plaintiff's case consisted of her own testimony and that of her husband, who testified briefly to her continuing disabilities, and medical records. There was no expert testimony.

*Facts.*

Plaintiff Delois Roberson had consulted Dr. Jacobs with complaints of vaginal bleeding and intercourse pain. Dr. Jacobs told the plaintiff she might need a "D and C", a "scraping of the womb". He suggested Menorah Hospital, and he recommended Dr. Mooney to perform the operation. Plaintiff entered Menorah Hospital. Dr. Mooney saw the plaintiff three or four times before the surgery, and recommended removal of the uterus, because she had "tumors". Plaintiff agreed to the surgical removal of the uterus. Dr. Mooney told her she would be in the hospital about five days and then would spend about six weeks recuperating. Dr. Jacobs also continued to call upon plaintiff in the hospital after Dr. Mooney had entered the case.

The surgery, described as a "vaginal hysterectomy" was performed on March 25, 1974. She apparently was discharged from the hospital on April 1. She testified she had not improved when she left the hospital.

She continued to have difficulty after her return home. She went back to Dr. Mooney twice, but according to her testimony he gave her no treatment. Dr. Mooney referred her to Dr. Wise. Dr. Wise first saw her on April 15. He discovered she had "a leakage", gave her some pain pills and put a catheter in her. The leakage was found to result from a vesicovaginal fistula, which allowed the leakage of urine from the bladder into the vagina. The Menorah clinical resume said the leakage had shown up three days before the April 15 examination. On April 28 she returned to Menorah Hospital, still under the care of Dr. Wise. This time she underwent an operation described in the hospital records as "cystocopy with retrograde and drainage of urinary extravasation". "And he explained to me that he was trying to stop the leakage, this hole, or whatever", the plaintiff said. Plaintiff described the second operation as follows: ". . . He had made an incision in my side and put a tube there for my urine to pass." She was discharged on May 1.

Plaintiff was hospitalized yet a third time, on May 30. On this occasion she underwent major surgery "because the tube that was there . . . wasn't healing because I was having the IVP and he put me back in and did major surgery to repair it". She was discharged on June 8, 1974. The condition for which the April and May surgeries were performed was the vesicovaginal fistula. The condition was apparently corrected by the May 30 surgery.

Plaintiff testified that after the operation and still at the time of the trial, which began April 17, 1978, she was not able to lift anything too heavy. She was unable to sit too long or stand for a length of time because she got gas in her left side. She

1. While we refer to "plaintiff" in the singular throughout the opinion, both Delois Roberson and her husband, James Roberson, were plaintiffs.

was aided in her housework by her husband, her three sons and sometimes her mother. Before the first operation she had been able to do lifting at home and at work. In July after the operation, plaintiff returned to her work at Western Electric where she was employed as a "process checker", and continued to work there until August of 1975 when she was laid off due to a work shortage.

Plaintiff's claim against Dr. Mooney, who had died before trial, had been settled for $4,500 and dismissed.

*Duty of hospital to advise patient of risks of surgery and alternatives.*

We look to appellant's brief to find that she believes her evidence made a prima facie case against defendant hospital "because of a lack of informed consent to surgery". The surgery to which she says she gave no informed consent was the vaginal hysterectomy, to which we gather she attributes the vesicovaginal fistula which necessitated the two following surgical operations and the difficulties and disabilities she described in her testimony. She claims it was the duty of the hospital to explain to her the risks involved in the first surgery, the possibility of complications and possible alternative methods of treatment.

The hospital, on the other hand, claims that it was under no such duty as the plaintiff attempts to place upon it.

2. The consent signed by plaintiff is here set out in full:

I, the undersigned, being a patient at The Menorah Medical Center, Kansas City, Missouri, having engaged Dr. Mooney, a physician and surgeon, to administer to me certain medical and surgical treatment, hereby consent to and authorize the administration and performance of the following (operation) (treatment) (procedure): Vaginal Hysterectomy which I under-
 (medical terminology)
stand to be _____ to be performed by the above named physician and
 (in layman language)
surgeon, or any physician and surgeon, or any physicians or surgeons associated with or by him, or acting under any of their instructions utilizing the facilities of The Menorah Medical Center.

It becomes necessary to state the evidence of the hospital's role in securing the written consent. We will use plaintiff's words with some editing:

Plaintiff was in the hospital in the surgical ward on the evening before the scheduled surgery. Plaintiff's husband came to visit her and plaintiff thought he had to sign the consent. A friend of hers who had had the same operation had told plaintiff that her husband had been required to sign the consent. Plaintiff called the nurse and told her that her husband was there to sign the papers. The nurse said he didn't have to sign them. The nurse brought in the consent form, left it and went back out. Plaintiff read it and it said "hysterectomy", and plaintiff thought that meant removing everything. Plaintiff went out to the nurses' station and told the nurse, "I'm not having everything removed, just the uterus". Plaintiff did not read the entire consent form. The word "hysterectomy" struck her; it was standing out. The nurse said, "Well, that's the way it's worded", and plaintiff said, "Well, how is he supposed to know he's not supposed to take everything, when it says 'hysterectomy' and I'm only having one thing removed?" The nurse replied, "The doctor knows, it's on his chart". Plaintiff signed the consent. Plaintiff did not think she read any other portion of the permit than "vaginal hysterectomy". Nobody read the form to her and nobody made any explanation of any other material in that form.[2]

The aforementioned (operation) (treatment) (procedure) shall include consent for arrangements for anesthesia procedures as may be considered necessary or advisable by the aforementioned physician and surgeon, by the Department of Anesthesiology of Menorah Medical Center or Anesthesiology Services, Inc., and any preliminary and/or further or additional treatments and operations, tests, transfusions, injections that may be, in the judgment of said physician and surgeon or any other physicians or surgeons that may be associated with or by him or any of his designees considered or deemed advisable or necessary at the time the contemplated (operation) (treatment) (procedure) is being performed, or at any time subsequent thereto, until I am discharged from The Menorah Medical Center.

The nature and purpose of the cited procedure, possible alternative methods of treat-

After this testimony from the plaintiff, her counsel asked her whether she would have permitted the surgery "if it had been explained that there were certain risks to this vaginal hysterectomy, as the paper stated, 'risks involved, possibility of complications and possible alternative methods of treatment'". Plaintiff replied that she would not have permitted the surgery.

Plaintiff introduced into evidence minutes of meetings of the medical records committee of the defendant hospital, held June 20 and July 14, 1969, in which patient consent and waiver forms were under consideration. The committee apparently had under consideration at that time a number of forms for patients' consents and waivers. Pertinent to the form signed by the plaintiff are the following excerpts from those minutes: "In the permit for surgery—layman language—it was pointed out that a nurse would be filling this in rather than the physician. *The question also arose as to how the physician would fulfill the requirements of telling the patient of the risks involved* . . . It was also recommended that these forms be presented to various departments, not just the chairman, for their approval." (Italics ours.) We find in the minutes of the medical records committee meetings no other references to any form for consent to surgery.

There is no evidence in this record giving rise to a duty on the part of the defendant hospital to inform the patient of risks attendant upon this surgical procedure, or to inform her of alternative methods of treatment. Plaintiff was the patient of Dr. Jacobs and Dr. Mooney. It was Dr. Mooney who recommended the vaginal hysterectomy and who discussed it with plaintiff. There is no suggestion in the evidence that either physician was an agent of the hospital.

The presentation to the patient of risks involved in prospective surgery cannot but call for some very nice judgments. On the one hand the patient is entitled to such information as he needs to make an intelligent decision and to give an informed intelligent consent. And yet the patient may have his apprehensions unnecessarily and unduly heightened if risks are unwisely presented, leading him to an imprudent choice. Risks must be placed in perspective. The one dealing with the patient at this point must have knowledge of the patient— his temperament, his intelligence, his mental condition and his physical condition. He must also have a knowledge of the surgery itself—its risks, whether imminent or remote, and whether it is pressing, deferrable or optional. He must know the availability of conservative methods of treatment, if any, and their promises for success as compared to the surgery. All these factors must be placed in the equation. The physician alone is equipped to make the delicate judgments called for. *Fiorentino v. Wenger*, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296, 300 (1967).

ment, the risks involved, and the possibility of complications have been explained to me. I acknowledge that no Guarantee or assurance of the results that may be attained has been given by anyone.

(Applicable only if surgery) I consent to the pathological study and disposal by hospital authorities of any removed tissues. It has been explained to me that, during the course of the operation, unforeseen conditions may be revealed *that necessitate an extension of the original procedure(s) or different procedure(s) than stated above.* I therefore authorize and request that the above named surgeon, his assistants, or his designees perform such surgical procedures as are necessary and desirable to the exercise of professional judgment. The authority granted here shall extend to treating all conditions that require treatment which were not known to the named surgeon at the time the operation is commenced.

The intention being to grant full authority to the said physicians and surgeons and said Menorah Medical Center, all their respective employees and assistants, to administer and perform all and singular any drugs, treatments, tests, or diagnostic procedures to or upon me which may now, or during the contemplated services be deemed advisable or necessary by the herein designated physician or surgeon, or any physicians or surgeons associated with or by him or acting under their or any of their instructions.

/s/ Delois H. Roberson /s/ Norma Hanewalt RN
Patient, or Person Respon- Witness
sible for the Patient

3-25-74 7 pm
Date Time

We speak in general terms, of course, recognizing that the hospital may in some cases have a responsibility in this area. See *Gridley v. Johnson*, 476 S.W.2d 475, 483–485 (Mo.1972); *Fiorentino v. Wenger, supra*; Hospital Law Manual (Health Law Center: Aspen Systems Corp.) Nov. 1977 UPDATE. But the present case is not one of those, and we hold that the defendant hospital in this case was under no duty to inform the plaintiff of the surgical risks.

*Assumption by hospital of onus of advising patient of risks of surgery and alternatives.*

Plaintiff, however, has argued that the hospital *assumed* the duty of informing the patient of the risks involved in the surgery and the possible alternate methods of treatment when the hospital furnished to plaintiff the consent form for her signature, and when it adopted the printed form of the consent. There is actually no evidence that the consent form signed by plaintiff had been adopted by the hospital, but we will assume for present purposes that it was.

Plaintiff cites us to no authority nor does she advance any plausible argument that the actions of the hospital in securing the consent, as described earlier in this opinion, or in adopting the printed form, was an assumption by the hospital of a duty which we have held was the business of the physician.

There was no reason for the hospital to suspect that the plaintiff had not been informed of risks and alternatives to the surgery. The form in fact contained the following recital: "The nature and purpose of the cited procedure, possible alternative methods of treatment, the risks involved, and the possibility of complications have been explained to me . . ." Plaintiff said she did not read that part, but nothing prevented her from perusing its every word. Plaintiff was a high school graduate. She signed the form after apparently being satisfied about the meaning of the words "vaginal hysterectomy". A sentence in the medical records committee minutes, italicized above, shows the committee had in contemplation that the physician would explain the risks of surgery. No, we cannot agree that the hospital assumed that duty.

The cases cited by the plaintiff are of no aid to her. *Moore v. Webb*, 345 S.W.2d 239 (Mo.App.1961), is a case in which the defendant pulled all of plaintiff's teeth while she was under anesthesia. She had authorized the extraction only of certain of the teeth. The permit which she had signed as she sank into anesthesia, without consultation, was held not to be binding upon her, and furnished no defense to the dentist. Plaintiff does not claim that the physician exceeded what she actually intended and actually expected in removing her uterus by means of the vaginal hysterectomy. She simply claims that there were complications and risks of which she was not informed, and that, if she had been so informed, she would not have consented to the surgery. This, she contends, vitiates the consent which she signed.

In the other case cited by plaintiff, *Gridley v. Johnson, supra*, the alleged negligence consisted of performing a "D and C" upon plaintiff without first ascertaining whether she was pregnant. The case holds that a motion to dismiss plaintiff's petition against the hospital should not have been sustained without giving plaintiff an opportunity to plead further. The court observed, as noted above, that the duty of physicians and that of hospitals are not always definitely separated, and in some circumstances the hospital might have some responsibility for contraindicated surgery performed therein, even by an independent physician. But it falls far short of placing upon the hospital, in a case like the one now before us, the onus of explaining risks of surgery and the availability of alternative methods of treatment.

*Scientific treatise as proof of contents.*

Plaintiff offered to read to the jury, as a part of her proof, a passage from a medical treatise on gynecology. Plaintiff's attorney stated that his purpose in offering this passage was "to show the alternative methods of treatment . . . I

feel it's proper and admissible to have this in evidence showing a matter of alternative methods of treatment available." Even if this were allowable proof, as it is not in Missouri, *Hemminghaus v. Ferguson*, 358 Mo. 476, 215 S.W.2d 481, 489 (1948); *Cooper v. Atchison, T. & S.F.R. Co.*, 347 Mo. 555, 148 S.W.2d 773, 779–780 (1941), *cert. denied* 313 U.S. 591, 61 S.Ct. 1116, 85 L.Ed. 1546 (1941), it would not aid plaintiff's case since we have held that it was not the hospital's responsibility to advise the plaintiff of alternative methods of treatment.

*Absence of expert testimony on medical cause and effect and on risk of surgery.*

This record presents two other possible lacunae in plaintiff's case, which we will note without extended discussion.

 The second and third surgeries seem to have been necessitated by the vesicovaginal fistula which allowed the leakage of urine from the bladder into the vagina. The clinical resume of Menorah Medical Center recites that vaginal leaking showed up almost three weeks after the hysterectomy and this leakage was traced to the fistula. There is first no expert testimony that the hysterectomy caused the fistula. It is not obvious to the layman that it did so. In an area calling for medical knowledge, it would require expert testimony to establish the connection between the two. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978).

Furthermore, though the fistula might be the result of the hysterectomy, is it a "risk" of the hysterectomy of which plaintiff in good medical judgment and practice should have been advised? It is a question with which the layman would be ill equipped to deal without the aid of expert testimony, of which there was none. *Aiken v. Clary*, 396 S.W.2d 668, 673–674 (Mo.1965); *Fiorentino v. Wenger, supra*; *Longmire v. Hoey*, 512 S.W.2d 307 (Tenn.App.1974); *Bly v. Rhoades*, 216 Va. 645, 222 S.E.2d 783 (1976).

*Conclusion.*

The judgment is affirmed.

All concur.