(March 23, 2004)

MARY QUINN et al., Appellants, v BOOTH MEMORIAL HOSPITAL et al., Defendants, and EMMANUEL G. PAPPOUS, M.D., et al., Respondents. [773 NYS2d 402]—

Order, Supreme Court, Bronx County (Kenneth Thompson, J.), entered April 9, 2003, which granted summary judgment to defendants Pappous, Tarasuk and Weinbaum and dismissed the complaint as against them, unanimously modified, on the law, to the extent of denying summary judgment to defendants Pappous and Weinbaum and reinstating the first, second and third causes of action as against them and, as so modified, affirmed, without costs.

In their complaint and bill of particulars, plaintiffs alleged that, while plaintiff Mary Quinn was a patient at Booth Memorial Medical Center for the treatment of pneumonia and the delivery of a baby, she suffered various injuries as a result of defendants' negligence, which included misdiagnosing her vaginal bleeding, failing to diagnose a laceration in her bladder and forcing her to undergo unnecessary surgical procedures. Plaintiffs further alleged that defendants' negligence caused the wrongful death and conscious pain and suffering of the infant Meagan Quinn and their loss of her services.

Defendants Pappous, Tarasuk and Weinbaum moved for summary judgment on the strength of the medical office and hospital records and the affidavits of Dr. Frank Chervenak, on defendant Pappous's behalf, and Dr. Jason Green, on behalf of defendants Tarasuk and Weinbaum. Drs. Chervenak and Green opined that defendants' care of Mary Quinn and Meagan Quinn was in accord with good and accepted medical practice and that no act or omission on their parts was the proximate cause of either Mary Quinn's injuries or her child's death. Dr. Chervenak averred that Pappous's evaluation of Mary Quinn, who was referred to him by her obstetrician on March 12, 1985 for the treatment of a severe cough, led to the timely identification of the etiology of her complaints and the appropriate prescription of an antibiotic that had no deleterious effect on her pregnancy, and that Pappous appropriately consulted with Mary Quinn's obstetrician about the prescribed method of treatment. Dr. Chervenak opined that Pappous appropriately recommended hospitalization on plaintiff's second visit to him, on March 28, 1985, since the oral antibiotics had not worked, and that his subsequent prescription of a broad spectrum antibiotic was appropriate, as confirmed by an April 8, 1985 chest film that showed the pneumonia to be clearing.

Dr. Jason Green stated that, according to defendant Pappous's note in the hospital record, Mary Quinn underwent a cesarean section on April 10, 1985, during which she developed hypotension and a drop in oxygenation. Dr. Green opined that Heparin was properly prescribed for the pulmonary embolus that was revealed on an angiogram after the surgery. Plaintiff having experienced vaginal bleeding throughout the night of April 12, a vaginal examination was performed, blood clots removed and a Foley catheter inserted. Dr. Green opined that the Heparin was appropriately discontinued when the bleeding continued through April 13, and that defendant Weinbaum timely and appropriately inserted a transvenous Greenfield filter, the only remaining available treatment for plaintiff's potentially fatal condition.

Dr. Green noted that from April 13 to April 15 plaintiff complained intermittently of abdominal pain, for which she was given pain medications, and that the Foley catheter was either removed or fell out several times. However, he stated that plaintiff's urine was clear and her bladder did not become distended and uncomfortable until April 15, 1985, at which time a CT scan was performed, revealing the laceration of the bladder and the fact that the Foley catheter traversed the bladder and the uterus. Dr. Green opined that defendant Weinbaum could not have diagnosed the bladder laceration any earlier than April 15, because there were no signs and symptoms of a bladder tear—e.g., bleeding, leaking urine and blood and abdominal distention and discomfort—before that date. Finally, Dr. Green opined that defendant Tarasuk comported with accepted standards of practice in simply and without complication repairing Mary Quinn's torn bladder on the day that the laceration was discovered.

The motion court properly granted summary judgment to the moving defendants on the causes of action arising from plaintiffs' allegations of malpractice in the treatment of the infant Meagan Quinn. Dr. Chervenak opined that no act or omission by defendant Pappous in his care of the pregnant Mary Quinn caused her child's death. There is no evidence in the record that either of the other moving defendants treated Mary Quinn before she gave birth or that any one of the three treated the infant after her birth. The record reflects that after delivery the infant was "handed over to the Pediatrician," intubated, placed on a respirator and transferred to North Shore University Hospital, where she died 17 days later. In opposition to the motion, plaintiffs submitted the affidavit of an expert who opined that the cause of the infant's death was improper intubation.

However, since there is no evidence in the record that any of the moving defendants participated in the intubation, this submission failed to demonstrate the existence of a factual issue (*see Zuckerman v City of New York*, 49 NY2d 557, 560 [1980]).

The court also properly granted summary judgment to defendant Tarasuk dismissing the entire complaint as against him. Dr. Green opined that Tarasuk repaired Mary Quinn's lacerated bladder in accordance with good and accepted medical practices, and there is no evidence in the record that he was consulted any earlier than the day of the surgery. In opposition, plaintiffs' expert expressed no opinion on the care defendant Tarasuk rendered Mary Quinn.

Summary judgment should not have been granted, however, to defendants Pappous and Weinbaum on the causes of action arising from plaintiffs' allegations of malpractice in the treatment of Mary Quinn. As to defendant Pappous, Dr. Chervenak's opinion was limited to Pappous's treatment of Mary Quinn while she was pregnant. Defendants presented no expert evidence on the propriety of Pappous's postdelivery care of Mary Quinn despite the documentation in the hospital record that Pappous continued to treat her after she gave birth on April 10, 1985. The record shows that between April 10 and April 15, the day the bladder laceration was discovered and repaired, Pappous saw her, examined her, prescribed medication for her and, along with nurses and other physicians, made notes in the record. Defendants' failure to establish that Pappous's treatment of Mary Quinn after she gave birth was in accord with good and accepted medical practice requires the denial of summary judgment (*see Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

As to defendant Weinbaum, the hospital record unequivocally contradicts Dr. Green's factual averments that Mary Quinn's urine was clear until April 15 and that there was no other evidence that she was bleeding until that date, and demonstrates that Dr. Green's conclusion that Weinbaum could not have diagnosed the bladder laceration before April 15 was unfounded. On April 12, a note in the hospital record indicated that the Foley catheter was "draining clear yellow urine." However, on April 13, after Mary Quinn had been bleeding heavily from the vagina all night long and had received blood by transfusion, a note recorded on behalf of defendant Diamandis, the obstetrician, indicated that a vaginal examination "produced large quantity of blood and clots," and that after the clots were "evacuated" there was "no significant further bleeding noted."

In the April 13 note the obstetrician indicated that the insertion of the Foley catheter revealed "gross hematuria [the pres-

ence of blood or blood cells in the urine] with clotting off a foley almost immediately," and that a three-way Foley was inserted and "manually irrigated for bright red blood and clots." The obstetrician noted that the decision had been made to discontinue the Heparin and proceed with the insertion of a Greenfield filter and concluded, "Would continue IM Methergine and attempt to keep bladder from becoming over-distended to reduce risk of uterine [unintelligible]."

From these notes it can be inferred that symptoms of a bladder laceration were noted on April 13, before the Greenfield filter was inserted, and that a CT scan at that time would have revealed the bladder laceration and obviated the need for the Greenfield filter. Defendants' failure to establish that Weinbaum could not have diagnosed the bladder laceration before April 15 requires the denial of summary judgment (*id.*). Concur—Buckley, P.J., Tom, Ellerin and Williams, JJ.