■ NICOLE K. WELCH et al., Appellants-Respondents, v ANDREW H. SCHEINFELD et al., Respondent, and MEDICAL CENTER OF UNITED WIRE, METAL & MACHINE HEALTH & WELFARE FUND, Respondent-Appellant. [801 NYS2d 277]—

Order, Supreme Court, New York County (Stanley L. Sklar, J.), entered on or about October 22, 2003, which granted in part and denied in part defendant Medical Center of United Wire, Metal & Machine Health & Welfare Fund's motion for summary judgment, and defendant Dr. Andrew H. Scheinfeld's cross motion for summary judgment, and granted defendant Beth Israel Medical Center's cross motion for summary judgment, and or-

der, same court and Justice, entered November 12, 2004, which denied plaintiffs' motion for renewal, but granted reargument to the extent of clarifying that plaintiffs may seek to hold defendant United Wire liable under the doctrine of ostensible agency, unanimously modified, on the law, to reinstate plaintiffs' claim of negligence against United Wire and Dr. Scheinfeld for the doctor's alleged failure to properly assess the mother's pelvic condition in preparation for birth, and to grant renewal, and upon renewal, to reinstate the claims against United Wire and Dr. Scheinfeld for the alleged failures related to the prenatal care provided to Mrs. Welch and the delivery of the infant plaintiff, including: failure to recognize active labor; failure to diagnose feto-pelvic disproportion; failure to recognize arrests of dilatation and descent; failure to evaluate the patient's history; and failure to deliver by cesarean section based upon the previous allegations and "totality of the circumstances," and otherwise affirmed, without costs.

On January 20, 1999, Mrs. Welch, then eight weeks pregnant, began prenatal care at Local 810[1] Medical Center. This clinic was run by her husband's union, the United Wire, Metal & Machine Health & Welfare Fund (the union). All of Mrs. Welch's gynecologic and obstetric care and treatment had been provided at this clinic by its physicians. Dr. Scheinfeld had been Mrs. Welch's gynecologist since 1998, and was assigned to her at the clinic as her obstetrician for this pregnancy. He had admitting privileges at Beth Israel Medical Center.

Mrs. Welch, then 35 years old, suffered from untreated hypertension. This was Mrs. Welch's second pregnancy. In September 1990 she had given birth to an 8-pound, 15-ounce baby boy by vaginal delivery. After Mrs. Welch's son was born, he spent 10 days in a neonatal intensive care unit.

For the pregnancy at issue here, Mrs. Welch's estimated due date was September 3, 1999. During the course of her prenatal care, Welch had six sonograms, all of which were normal. She also had five visits, all with Dr. Scheinfeld, at the union clinic. At an examination on May 19, 1999, when the baby was at approximately 25 weeks, Dr. Scheinfeld measured a fundal height[2]

---

**1.** Local 810 is a branch of the United Wire, Metal & Machine Workers' Union.

**2.** Fundal height is a measurement from the mother's pubic bone to the top of her uterus. The measurement can be helpful in estimating the gestational age of a baby.

of 32 centimeters, which was disproportionally high.[3] At his deposition, Dr. Scheinfeld testified that the discrepancy between gestational age and fundal height either indicated that the baby was macrosomic (large for its gestational age), or that there was elevated amniotic fluid. In June of 1999, Mrs. Welch was diagnosed with and treated for gestational diabetes.

Because of her medical history, Mrs. Welch's pregnancy was considered "high risk," and she was referred to Dr. Salzman, a perinatologist.[4] He recommended that the baby be delivered at 39 weeks. If the fetal weight was less than 4,250 grams (nine pounds, six ounces) a vaginal delivery was recommended and if larger, a cesarean section was suggested. The last sonogram prior to delivery was performed on August 5, 1999. At that time, the infant weighed 3,333 grams, plus or minus 407 grams (between six pounds, 7.5 ounces and eight pounds, 5.5 ounces).

On August 11, 1999, 37 weeks into the pregnancy, Mrs. Welch saw Dr. Scheinfeld at the union clinic. She complained of vaginal discharge. Dr. Scheinfeld examined Mrs. Welch and found that she was four centimeters dilated and 70% effaced, and that the baby was at minus one station.[5] He referred Mrs. Welch for an amniocentesis to determine whether the baby's lungs were sufficiently mature for immediate delivery. The amniocentesis revealed that the lungs were mature and Mrs. Welch was admitted to Beth Israel at 5:30 P.M.

By 2:10 A.M. on August 12, Mrs. Welch was five centimeters dilated and 90% effaced, and the baby's head was at the minus two station. Mrs. Welch's water broke at 5:30 A.M. but the head was still at the minus two position. At approximately 6:30 A.M., Dr. Scheinfeld ordered Pitocin to augment the labor and assist the descent of the baby.

Mrs. Welch was taken to a delivery/operating room at 7:45 A.M. After approximately 15 to 20 minutes of pushing, Dr. Scheinfeld performed an episiotomy. The baby's head appeared at approximately 8:02 A.M., but its shoulder became impacted against the mother's pelvis, a condition called shoulder dystocia. Dr. Scheinfeld decided not to lengthen the episiotomy. Rather,

---

**3.** Apparently, between the 20th and 31st weeks of a pregnancy, the gestational age, measured in weeks, should correlate to the fundal height, within two to three centimeters. The baby's fundal height continued to be disproportionate to the approximate gestational age at Mrs. Welch's June 2, 1999, June 16, 1999, and June 30, 1999 examinations.

**4.** A perinatologist is an obstetrician who specializes in high risk pregnancies.

**5.** This is a measurement of the baby's location, used to determine descent into the birth canal.

he and two assisting doctors performed the McRoberts maneuver,[6] and one of the three of them applied, supra-pubic pressure. Nicole, a nine-pound, two-ounce baby girl, was born at 8:03 A.M. with a bruised face and suffering from a brachial plexus injury[7] and Erb's palsy.[8] She was immediately taken to the neonatal intensive care unit.

Plaintiffs then brought this action against the union, Dr. Scheinfeld and the hospital. The complaint and bill of particulars alleged that during the prenatal treatment and the delivery, both mother and child were injured as a result of defendants' negligence. The specific acts and omissions claimed are described in extensive detail in plaintiffs' bill of particulars. Defendant union moved for summary judgment, asserting, among other things, that Dr. Scheinfeld was an independent contractor, for whose negligence it was not vicariously liable. The union also submitted an affidavit from Dr. Debrovner. He stated he had reviewed the medical records and concluded that Dr. Scheinfeld acted in accordance with acceptable medical practice. Dr. Debrovner opined that Nicole's injuries were the direct result of the life-saving measures performed by the doctors during the delivery.

Dr. Scheinfeld cross-moved for summary judgment. He relied upon Dr. Debrovner's affidavit, the medical records, and his own deposition testimony. Beth Israel also cross-moved for summary judgment. It argued that Dr. Scheinfeld was not a hospital employee, but a private attending physician, and that its staff properly carried out Dr. Scheinfeld's instructions. It submitted the affirmation of another expert, Dr. Petrikovsky, to support its contentions.

In response, plaintiffs provided an affirmation from a licensed obstetrician.[9] This expert had reviewed the treatment records and provided a detailed time line of the relevant events. Plaintiffs' expert opined that there were a number of departures from acceptable medical practice. Specifically, the doctor stated

---

**6.** This is a procedure whereby the mother's legs are flexed against her abdomen, to facilitate vaginal delivery where fetal shoulders are impacted.

**7.** This injury occurred because the baby's arm was stretched or pulled, injuring a plexus of nerves that comes off the spinal cord just below the neck. These nerves control arm movements.

**8.** Erb's palsy is a syndrome which can be caused by a brachial plexus injury. The injury causes the affected arm to lose motor function, and, as a result it hangs to the side of the body. Since 1999, Nicole has had several operations, with little success at rehabilitating and regaining use of her arm.

**9.** While the physician's name is redacted in the record, the first order appealed reveals that the identity of the expert was made known to the motion court.

that by 2:10 A.M. on August 12, 1999, "Mrs. Welch had been in the active phase of labor for 8 to 10 hours." This, plaintiffs' affirmant said was true because Mrs. Welch was five centimeters dilated, 90% effaced, and at the minus two station.[10] Plaintiffs' expert further postulated that, at this stage in labor, the normal rate of descent for a woman who has had a prior vaginal delivery is approximately 1.5 centimeters per hour. Plaintiffs' doctor concluded that the failure of Mrs. Welch's cervix to dilate, combined with the failure of the fetus to descend between 2:10 A.M. and 5:30 A.M., was an indication that feto-pelvic disproportion (FPD) was present. The expert hypothesized that had Dr. Scheinfeld diagnosed FPD timely, proper intervention, including a cesarean section, could have been performed and the infant's injuries would have been avoided. This doctor also concluded that it was a departure from good and accepted medical practice for Dr. Scheinfeld to attempt a vaginal delivery in the face of this condition.

Further, plaintiffs' expert stated that in light of other indications that Mrs. Welch was carrying a macrosomic baby, an additional sonogram should have been performed. Plaintiffs' affirmant also asserted that Dr. Scheinfeld should have performed a clinical pelvimetry. This test, plaintiffs' expert surmised, in conjunction with the additional sonogram, would have shown that a cesarean section was needed. Plaintiffs' expert also opined that it was a departure for Dr. Scheinfeld not to have extended the episiotomy to facilitate delivery once it was apparent that the child's shoulder was impacted.

In reply, counsel for Beth Israel argued that there was no support in the records for the claim that Mrs. Welch had been in "active labor" for 8 to 10 hours by 2:10 A.M. on August 12, 1999. Dr. Scheinfeld submitted an affidavit stating that there was also no evidence of either "feto-pelvic disproportion or failure to progress." The union also provided an Internal Revenue Service form 1099, and an affidavit in support of its position that Dr. Scheinfeld was an independent contractor for whom it could not be held vicariously liable. The motion court dismissed the action against the hospital. It also dismissed the action against the union and Dr. Scheinfeld, except for the claims against Dr. Scheinfeld based upon his alleged use of excessive traction, and his failure to extend the episiotomy. The court accepted defendants' argument that there was no support for concluding that Mrs. Welch was in active labor for 8 to 10 hours prior to 2:10 A.M.

---

**10.** Dr. Debrovner, defendants' expert, opined that cervical dilation of four centimeters does not conclusively indicate "active labor" for a woman, such as Mrs. Welch, who has previously had a vaginal delivery.

Plaintiffs moved for reargument and renewal, submitting an affirmation from a second obstetrician (the physician who had offered the original affirmation had died). Plaintiffs asserted that the court had improperly relied upon arguments raised by defendants for the first time in their reply papers and incorrectly held that there was no proof that defendants had failed to recognize active labor. Plaintiffs argued that, given the totality of the circumstances as they existed on August 11 and 12, 1999, and Mrs. Welch's prior obstetrical history, Dr. Scheinfeld was negligent in failing to timely order and perform a cesarean section. Plaintiffs also urged that the court had misapplied the principle of ostensible agency by concluding that the union was not vicariously liable for Dr. Scheinfeld's alleged negligence.

Defendants opposed, arguing, among other things, that plaintiffs' submission of an affidavit by a new expert in support of renewal was improper. The union presented an affidavit from Dr. Debrovner, stating Mrs. Welch was not in active labor until she received Pitocin. Dr. Debrovner also challenged plaintiffs' allegation that there was an "arrest of descent," because the baby descended rapidly after Pitocin was administered. The court denied renewal, but granted reargument, and determined that plaintiffs could pursue their claim that the union was liable for Dr. Scheinfeld's alleged malpractice on a theory of ostensible agency. We modify to reinstate certain claims of negligence against Dr. Scheinfeld and, vicariously, against the union, and otherwise affirm.

Beth Israel's motion for summary judgment was properly granted. A hospital is generally not liable for the acts or omissions of an independent physician with attending privileges at its facility who is retained by the patient (*Hill v St. Clare's Hosp.*, 67 NY2d 72, 79 [1986]; *Fiorentino v Wenger*, 19 NY2d 407, 414 [1967]; *see also Topel v Long Is. Jewish Med. Ctr.*, 55 NY2d 682, 683 [1981]). This is the rule unless the hospital knows that the patient is unaware of the dangers or novelty of a medical procedure to be performed (*see Fiorentino*, 19 NY2d at 417). Here, Mrs. Welch was at the hospital for the delivery of a child, ordinarily a routine medical procedure and one with which Mrs. Welch was personally familiar. She also knew that Dr. Scheinfeld was a private attending physician, and that he would be responsible for her care during the labor and delivery. Further, there is no evidence of negligence by any hospital employee. The record conclusively establishes that hospital staff kept Dr. Scheinfeld apprised of Mrs. Welch's condition before he arrived to deliver the baby. Finally, there is no evidence that the physicians who assisted Dr. Scheinfeld in the birth deviated

from any of his directions (*see Soto v Andaz*, 8 AD3d 470, 471 [2004]; *Filippone v St. Vincent's Hosp. & Med. Ctr.*, 253 AD2d 616, 618 [1998]).

With respect to the remaining defendants, the questions as to the onset of "active labor" were first raised by the defendants in their reply papers. Thus, the court should have granted plaintiffs renewal, to allow them to oppose this newly raised claim that Mrs. Welch was not in active labor until the Pitocin was administered (*see* CPLR 2221 [e] [2], [3] [motion to renew shall be based upon new facts and contain reasonable basis for failure to provide them on the prior motion]; *ME Corp., S.A. v Cohen Bros. LLC*, 292 AD2d 183, 185 [2002] [renewal properly granted to consider evidence responsive to argument raised on reply]; *Arce v 1681 Realty Holding Corp.*, 265 AD2d 157 [1999]).

In addition, the record, as augmented by plaintiffs' second expert's affirmation, shows there are numerous factual issues which preclude summary resolution of whether Dr. Scheinfeld comported with good and accepted medical practice in evaluating Mrs. Welch's medical history, overseeing her prenatal care, and delivering her daughter Nicole (*see Quinn v Booth Mem. Hosp.*, 5 AD3d 256, 259 [2004]). Some of the points on which the experts disagree include whether Dr. Scheinfeld negligently: (1) failed to recognize active labor; (2) failed to diagnose FPD; (3) failed to recognize arrests of dilation and descent; (4) failed to deliver by cesarean section; and (5) directed contraindicated fundal pressure.

Summary judgment is similarly premature with respect to the union defendant. The doctrine of ostensible agency has been the law of this state for over 100 years and it allows an employer to be held liable for its employees' acts under certain circumstances. This rule was articulated in *Hannon v Siegel-Cooper Co.* (167 NY 244 [1901]). In that case, the defendant department store advertised it had employees who could provide dentistry services to customers. A patient alleged that she sustained jaw and gum injuries as a result of the negligence of one of defendant's employees. The Court of Appeals sustained a judgment against the corporation, holding that: "[P]laintiff had a right to rely not only on the presumption that the defendant would employ a skillful dentist as its servant, but also on the fact that if that servant, whether skillful or not, was guilty of any malpractice, [plaintiff] had a responsible party to answer therefor in damages" (*id.* at 247).

The doctrine of ostensible agency is still viable and, where, as here, a patient seeks medical care from a clinic rather than an individual doctor, it provides a right of action against the clinic

based upon its agency relationship with the physician alleged to have committed malpractice (*see Hill v St. Clare's Hosp.*, 67 NY2d 72, 80-81 [1986] [discussing vicarious liability of a hospital for medical malpractice based upon doctrine of ostensible agency]). The Court of Appeals' analysis in *Hill* explains that the theory of ostensible agency is not strictly limited to employer-employee relationships, and that the relevant inquiry is whether the tort (here, the alleged malpractice) "consists of a violation of a duty which springs from the contract" between the principal and agent (*id.* at 80). Thus, issue of whether Dr. Scheinfeld was an employee or an independent contractor of the union clinic is not decisive as to the union's vicarious liability for the doctor's acts.

For example, in a case with facts similar to this, the Second Department applied the *Hannon* rule of ostensible agency (*Santiago v Archer*, 136 AD2d 690, 691 [1988]). The defendant in *Santiago* was a union medical clinic, and the court found there were issues of fact precluding summary determination of (1) whether the union held itself out as a health care provider; and (2) whether it exercised sufficient control over the defendant physician sufficient to be held vicariously liable for the physician's malpractice (*id.* at 692).

While in *Santiago* all of the plaintiff's medical care was rendered at the union clinic, the fact that this baby was delivered at a hospital and not at the clinic does not preclude the conclusion that Dr. Scheinfeld was nonetheless acting as the union's agent. Welch received all of her gynecological and prenatal care for both of her pregnancies from doctors at the union clinic. Her first child was delivered by a doctor assigned to her at the union clinic. Thus, it would not be unreasonable to conclude that Dr. Scheinfeld continued to act at the union's behest throughout the course of prenatal treatment and delivery of the baby Nicole at Beth Israel Medical Center. Accordingly, should the jury determine that the clinic held itself out as a health care provider, and that Dr. Scheinfeld was its agent in providing obstetric care to Mrs. Welch and Nicole, it would be estopped from disclaiming liability for the alleged acts of malpractice. Concur—Mazzarelli, J.P., Ellerin, Gonzalez and Catterson, JJ.