| **Kaplow v Dalbagni** |
|:---:|
| 2024 NY Slip Op 34556(U) |
| December 19, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 805183/2019 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  **HON. JOHN J. KELLEY**                    PART                    56M

*Justice*

--------------------------------------------------------------------------------X

JAMES R. KAPLOW,

INDEX NO.               805183/2019

Plaintiff,

MOTION DATE          10/15/2024

- v -

MOTION SEQ. NO.          002

GUIDO DALBAGNI, M.D., ROBERT C. SMITH,
M.D., SPYRIDON BASOURAKOS, M.D., and
MEMORIAL SLOAN KETTERING CANCER
CENTER,

**DECISION + ORDER ON
MOTION**

Defendants.

--------------------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 002) 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 71

were read on this motion to/for                    SUMMARY JUDGMENT                    .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted medical practice and lack of informed consent, the defendants Guido Dalbagni, M.D., Robert C. Smith, M.D., and Memorial Sloan Kettering Cancer Center (collectively the Sloan Kettering defendants) move pursuant to CPLR 3212 for summary judgment dismissing the complaint insofar as asserted against them. The plaintiff opposes the motion. The motion is granted to the extent that the Sloan Kettering defendants are awarded summary judgment dismissing (a) the lack of informed consent cause of action, (b) so much of the medical malpractice cause of action was premised upon their alleged failure to diagnose the plaintiff's condition, their alleged failure to order or undertake proper testing, their alleged failure timely to recognize that an indwelling Foley catheter that they had placed had fallen out, and their alleged failure properly to instruct other medical personnel as to the proper care of the plaintiff, and their alleged failure to consult with certain specialists, and (c) the plaintiff's claim, set forth in his bills of particulars, that they were liable for negligent hiring, training, supervision, and retention. The motion is otherwise denied, since there are triable issues of fact as to

[* 1]

whether Dalbagni and Smith negligently inserted a Foley catheter and negligently attempted to reinsert a new Foley catheter, whether those alleged departures from the relevant standard of care caused or contributed to the plaintiff's injuries and the need for additional procedures, and whether Memorial Sloan Kettering Cancer Center is vicariously liable for that malpractice.

The crux of the plaintiff's claims against the Sloan Kettering defendants is that, between December 1, 2018 and December 4, 2018, Dalbagni and Smith negligently inserted a Foley catheter during a radical prostatectomy, causing the catheter to fall out, and negligently attempted to insert a new catheter during diagnostic cystoscopy procedures, causing the perforation or distention of his bladder lumen, which, in turn, resulted in excessive urinary retention and the need to perform additional catheterizations. In his complaint, the plaintiff made only general allegations that the Sloan Kettering defendants departed from good and accepted practice and failed to obtain his fully informed consent to the procedure.

In his bills of particulars as to all of the Sloan Kettering defendants, the plaintiff alleged that those defendants negligently inserted a drainage catheter, that catheter fell out, and then those defendants negligently attempted to reinsert a new catheter at bedside. He further alleged that the Sloan Kettering defendants negligently perforated his bladder lumen, and failed timely to recognize that the catheter that they initially had placed had fallen out. In addition, the plaintiff asserted that the Sloan Kettering defendants failed to perform indicated and necessary examinations, evaluations, and diagnostic testing in a timely fashion, in that they failed to

> "promptly, properly, timely and adequately detect, discover, diagnose, consider, evaluate, investigate, treat and manage Plaintiff's conditions from which he was suffering at such time as it was treatable, operable, curable and/or manageable; fail[ed] to promptly, properly, timely and adequately order, direct, recommend, advise, refer, provide, perform and/or ensure the performance of such medical and/or surgical procedures as were urgently required to prevent the worsening of Plaintiff's condition; fail[ed] to promptly, properly, timely and adequately detect, discover, diagnose, consider, evaluate, investigate, treat, operate, remove and manage the said conditions prior to its progression; [and] fail[ed] to promptly, properly, timely and adequately detect, discover, diagnose, consider, evaluate, investigate, treat and manage the said conditions at such time as it was more easily treatable, operable, manageable and/or curable."

**805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO**
**Motion No.  002**

Page 2 of 22

[* 2]

Further, the plaintiff asserted that the Sloan Kettering defendants failed promptly, properly, or adequately to test for, evaluate, diagnose, and treat his conditions, despite "prolonged and persistent complaints, signs, symptoms and findings indicative" of those conditions, thus causing those conditions to remain undetected and untreated. Additionally, the plaintiff asserted in his bills of particulars that the Sloan Kettering defendants failed to provide proper, adequate, and necessary postoperative care.

Moreover, the plaintiff alleged that the Sloan Kettering defendants failed to administer proper instructions to the various physicians and other hospital and medical personnel in the care and treatment that they rendered to him, both operatively and postoperatively. He also asserted that these defendants failed to take or record an appropriate medical history and, thus, could not make use of his medical history.

The plaintiff also alleged that the Sloan Kettering defendants did not obtain his fully informed consent to the prostatectomy, and the subsequent cystoscopies and catheterizations, because they failed to inform him of the risks and benefits of the procedures, or the alternatives thereto. He asserted that, had he been fully informed, he would not have elected to undergo the subject procedures. The plaintiff also faulted the Sloan Kettering defendants for failing to ensure that he was rendered treatment by appropriate medical providers, in failing to obtain consultations with appropriate specialists, and in negligently "hiring, investigating, credentialing, training and supervising their employees, contractors, affiliates, servants, agents, representatives and/or other persons or entities in its control."

As a consequence of these allegedly wrongful acts, the plaintiff asserted that, after he underwent the initial radical prostatectomy, the indwelling urethral Foley catheter fell out due to displacement, causing the need, on December 2, 2018 to perform a cystoscopy and to insert a new catheter,a that led to the perforation of his bladder lumen, which, in turn, caused undue urinary retention as a consequence of his inability fully and properly to void his bladder, as well as related urinary incontinence and bladder leakage at times that he did not wish to void his

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO                    Page 3 of 22
Motion No.  002

3 of 22

[* 3]

bladder.  In addition to the allegations of suprapubic pain, the plaintiff alleged in his bills of particulars that he was obligated to undergo a second cystoscopy with placement of a urethral catheter on December 12, 2018, and a third cystoscopy on December 28, 2018, this time with both the placement of a Foley catheter and the dilation of the neck of his bladder.  He contended that his urinary problems and pain are permanent.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]).  The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212).  The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]).  In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]).  Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp.*, 18 NY3d at 503).  A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn.*, 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr.*, 161 AD2d 480, 480 [1st Dept 1990]).  Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the

**805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO**
**Motion No.  002**

Page 4 of 22

plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]). Where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and the insufficiency of or delay in treatment proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Perez v Fitzgerald,* 115 AD3d 177, 178 [1st Dept 2014]; *Perlin v King*, 36 AD3d 495, 495 [1st Dept 2007]; *see generally Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . . pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr*., 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp*., 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr*., 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc*., 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 5 of 22

5 of 22

Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]).  If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]).  Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id*., quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]).  Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr*., 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]).  Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).  In most instances, the opinion of a qualified expert that the plaintiff's

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 6 of 22

6 of 22

injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

In support of their motion, the Sloan Kettering defendants submitted the pleadings, the bills of particulars, the transcripts of the parties' deposition testimony, relevant medical and hospital records, an attorney's affirmation, a statement of allegedly undisputed material facts, and the expert affirmation of board-certified urologist and urologic oncology specialist Simon Hall, M.D. Dr. Hall opined that none of the Sloan Kettering defendants departed from good and accepted practice, that nothing that they did or did not do caused or contributed to the plaintiff's injuries, and that they obtained the plaintiff's fully informed consent to the procedures that they performed upon him.

Based upon his review of the relevant records and deposition testimony, Dr. Hall explained that, on August 26, 2018, the plaintiff first saw the defendant urologic surgeon Smith as an outpatient for the purpose of obtaining an opinion relative to the plaintiff's prostate cancer. Smith had written in the plaintiff's chart that the plaintiff was then suffering from prostatic adenocarcinoma, inasmuch as a June 12, 2018 biopsy yielded positive results for this condition at the left base medial of the plaintiff's prostate. Smith also reported that the plaintiff experienced erectile dysfunction and that, although the plaintiff was able to obtain a full erection, he had had difficulty maintaining it. Smith saw the plaintiff again on November 27, 2018 on an outpatient basos, at which time the plaintiff executed a consent form, agreeing to undergo a radical prostatectomy. Smith wrote in the plaintiff's chart that, given the plaintiff's history of Crohn's disease, he had been counseled by a Sloan Kettering radiation oncologist to avoid radiation, and Smith himself concluded that, in light of that history, as well as the plaintiff's prior abdominal surgery, the plaintiff required an open surgery. According to Dr. Hall, the plaintiff was offered sperm banking, but declined.

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 7 of 22

As Dr. Hall described it, on December 1, 2018, Smith and Dalbagni together performed a retropubic radical prostatectomy and pelvic lymphadenectomy procedure, with nerve sparing. According to Dr. Hall, the removal of the prostate necessitated the creation, during the surgery, of an anastomosis, that is, a surgically created connection, between the bladder and the urethra, the latter of which is the narrow tube that transports urine from the bladder through the penis. At his deposition, Smith testified that the plaintiff's bladder neck and urethra were connected during the procedure with approximately six stitches. The plaintiff's chart reflected that the surgery lasted almost four hours, while Dalbagni's operative note documented that Sloan Kettering surgical staff placed a Foley catheter for urination, which Dr. Hall described as a rubber tube, approximately 16 inches long, fitted with a small balloon that is placed at the bladder neck and inflated to prevent it from falling out of the bladder. Dr. Hall noted that, at Smith's deposition, the latter asserted that the prostate is located adjacent to the bladder and that, during the surgery, after the prostate is removed, a Foley catheter is placed in the bladder and stitched, creating a tight seal, allowing urine to void from the bladder, through the catheter, and thereafter through the urethra. As Dr. Hall interpreted Smith deposition testimony, Smith explained that he employed a Foley catheter, as opposed to a suprapubic catheter, which is a surgically inserted catheter inserted into the lower abdomen, because the Foley catheter maintains the urethra in an open position during healing. Hall essentially approved of Smith's testimony that "we want the area to essentially be . . . propped open so the edges heal without scar tissue," and of Smith's custom and practice of taping the Foley catheter to the thigh at the conclusion of the operation.

As Dr. Hall explained it, in a December 2, 2018 note, nurse Alexandra Nugent, RN, documented that, at 2:50 a.m. on that date, she was called to the plaintiff's bedside after he reported feeling wet and that his catheter had come out, and that she observed that the Foley catheter indeed was out of the patient and lying on the bed. According to the note, urology fellow Nirmal Thampi John, M.D., attempted to reinsert the Foley catheter at the bedside, an

event that Dr. John and Nora Love, RN, corroborated in their own later notes, but was unsuccessful, and that the next steps would be determined by the surgical team. Hence, as Hall described it, at 7:26 a.m. on December 2, 2018, Dalbagni called Love to assist him with a bedside cystoscopy and replacement of the Foley catheter. Dr. Hall explained that cystoscopy is performed by employing a cystoscope, which is a hollow tube that is inserted into the penis, through which a camera is placed, that allows the operator to visualize the urethra and bladder. Dalbagni testified at his deposition that, after attempting to replace the catheter under cystoscopic guidance at the plaintiff's bedside, the position of the catheter needed to be confirmed by a computed tomography (CT) scan. According to Dr. Hall, a December 2, 2018 CT scan report, referable to an imaging study performed at 11:42 a.m. on that date, stated that the new Foley catheter that had been inserted earlier that morning, including the balloon component, were present in the prostatectomy bed, that is, the location where the prostate had been before it was removed, albeit outside of the urinary bladder. As Dr. Hall recounted Smith's deposition testimony, the imaging depicted on the CT scan implied that "the catheter either went between two of the stitches or maybe loosened some of the stitches in that part of where it was sewn together. So, it went instead of into the bladder, it went actually just behind it."

Dr. Hall continued to explain that,

> "[o]n December 2, 2018, plaintiff was brought back to the operating room by Dr. Dalbagni and Dr. Smith. . . . Under general anesthesia, the [second] Foley catheter was removed and attempts at placing the Foley catheter with a guidewire were unsuccessful. . . . More specifically, the anastomosis which had been created between the bladder and the urethra, had opened, creating a false passage where the Foley catheter had been placed. . . . At that point, a suprapubic tube was placed through an incision in the lower abdomen and urine was evacuated from the bladder. . . . The surgery lasted from 1:33 p.m. to 2:59 p.m. . . . A December 2, 2018 interventional radiology report, authored by Dr. [Majid] Maybody, noted the suprapubic drainage catheter was observed within the bladder lumen on CT scan at 9:14 p.m."

As Dr. Hall read the plaintiff's chart, the plaintiff was discharged to his home in stable condition on December 4, 2018 at 6:05 p.m., with the suprapubic catheter in place and, on December 10, 2018, Smith advised the plaintiff over the telephone that the relevant pathology report revealed

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 9 of 22

9 of 22

more cancer than expected, but with surgical margins and lymph nodes that were negative for cancer. According to Dr. Hall, Smith formulated a plan, pursuant to which the plaintiff was to return to the hospital for a procedure to place yet another Foley catheter, which, as Dr. Hall explained it, "would allow for urination through the urethra and penis."

On December 12, 2018, between 11:21 a.m. and 12:52 p.m., Dalbagni performed a cystourethroscopy under general anesthesia to place a third Foley catheter. In his operative report, Dalbagni wrote that, using flexible cystoscopy, he was unable to place a the Foley catheter into the bladder because of the presence of a false passage between the urethra and the bladder, and stated that, during the procedure, he had consulted an interventional radiologist, who was able to place a nephrostomy tube through the plaintiff's urethra, and into the bladder, thus permitting the evacuation of urine. Dr. Hall explained that, although a nephrostomy tube is typically used to evacuate urine through the kidney, in the plaintiff's case, it was placed percutaneously through the urethra, and then into the bladder. According to Dr. Hall, the plaintiff was discharged home that same day in stable condition.

On December 22, 2018, the plaintiff called Smith and informed him that the third Foley catheter had fallen out, and that he was experiencing urinary incontinence. According to Dr. Hall, at this juncture, the suprapubic catheter already had been clamped and, thus, Smith instructed the plaintiff to unclamp the suprapubic catheter in the event that he was unable to urinate. Again, according to Dr. Hall, on December 23, 2018, the plaintiff called Smith on the telephone, and advised the doctor that he was urinating well and no longer leaking much into his pads. On December 28, 2018, Smith performed another cystoscopy, and allegedly visualized a healing bladder neck that remained stenotic, that is, narrowed. Although Smith attempted to dilate the bladder neck during the cystoscopy, he was unable to place a fourth Foley catheter, and instructed the plaintiff that if he could not urinate, the suprapubic tube would have to be opened up. Dr. Hall asserted that the plaintiff was discharged home that same day in stable condition. On January 3, 2019, the plaintiff called Smith, and allegedly reported that

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO                                    Page 10 of 22
Motion No.  002

10 of 22

his urinary leakage was minimal. On January 29, 2019, the plaintiff presented to Smith's office in New Jersey on an outpatient basis, at which time the suprapubic catheter was removed, leaving the plaintiff with no catheters in place. According to Dr. Hall, the plaintiff now is able to urinate through the urethra and penis.

Dr. Hall opined that the December 1, 2018 radical prostatectomy was an indicated procedure and that, in light of the plaintiff's diagnosis of prostatic adenocarcinoma, and his history of Crohn's disease, an open procedure was the proper type of procedure, as opposed to a laparoscopic or robotic procedure, since the plaintiff's Crohn's disease and prior abdominal surgery increased the risk of dense adhesions that would have made a laparoscopic and/or robotic surgery more difficult to perform than an open procedure. He further concluded that the radical prostatectomy was properly performed, and that Smith and Dalbagni properly placed the initial Foley catheter as an indwelling catheter, with the balloon in the bladder lumen and the catheter extending from the bladder, through the anastomosis and the urethra. Dr. Hall explicitly opined that the displacement of the indwelling Foley catheter overnight into December 2, 2018 was "not indicative of malpractice and constituted a rare and unavoidable occurrence." In addition, he stated that Dr. John's attempt to replace the Foley catheter at bedside was within the standard of care, and did not require the use of cystoscopic guidance or an additional surgery under general anesthesia. Rather, he concluded that "it was reasonable for Dr. John to attempt to replace the Foley catheter at bedside using 'feel,' otherwise known as sensory feedback, which is the most common way to place a Foley catheter."

Moreover, Dr. Hall opined that, after Dr. John was unable to place the Foley catheter at the plaintiff's bedside on December 2, 2018, Dalbagni's attempt to re-catheterize the plaintiff using a guidewire and cystoscopic guidance was within good and accepted practice, because "the use of cystoscopy and a guidewire allowed for additional visualization and guidance to place the catheter after Dr. John's first attempt to place the guidewire using only sensory

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Page 11 of 22
Motion No.  002

11 of 22

feedback was unsuccessful." He further asserted that it was appropriate for the Sloan Kettering defendants to perform a CT scan to confirm whether or not the catheter was properly placed, as it provided sufficient views and definition to assess the placement. Dr. Hall thereupon concluded that, after the December 2, 2018 CT scan determined the catheter was, in fact, improperly placed behind the bladder and not within the bladder, it was appropriate to bring the plaintiff back to the operating room. As he explained it, "[g]iven the potential risks of urinary retention and the development of a urethral stricture, it was imperative that plaintiff be recatheterized to allow urine to flow through the urethra." Dr. Hall further averred that, after the Foley catheter could not be placed intraoperatively, it was "appropriate to place a supra-pubic catheter because without a catheter placed in the bladder, plaintiff risked an inability to void and related sequelae, including an injury to the bladder." He also asserted that the plaintiff was appropriately discharged to his home on December 4, 2018. He also opined that, after the third Foley catheter came out, there were no alternative treatment options other than to try and recatheterize the urethra, an approach that was indeed attempted.

Dr. Hall expressly asserted that nothing that the Sloan Kettering defendants did or did not do caused or contributed to the injuries complained of by the plaintiff. In this respect, he stated that the displacement of the initially placed urinary catheter was not the result of a deviation from the standard of care, but, rather, was a "rare and unavoidable occurrence [that] resulted in the need to re-catheterize the plaintiff to permit him to urinate through the urethra and penis." As such, Dr. Hall concluded that the claimed injuries related not to the initial catheterization during the December 1, 2018 surgery, but to the re-catheterizations, including the December 2, 2018 cystoscopy and the December 12, 2018 re-catheterization with a nephrostomy tube, and that the supra-pubic pain associated with the supra-pubic catheter, was not the result of a deviation from the standard of care. Further, he asserted that the need for the December 28, 2018 bladder neck dilation was not caused by a prior deviation from the standard of care, but, rather, arose from the simple need to catheterize the plaintiff, inasmuch as, after

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 12 of 22

12 of 22

the initial indwelling catheter was displaced, the plaintiff was at risk for inflammation, scarring, and stricture, which could have resulted in an inability to urinate through the urethra and necessitated yet another re-catheterization of the plaintiff. Similarly, Dr. Hall concluded that the plaintiff's complaints of pain and urinary retention also were caused by the unavoidable loss of the plaintiff's initial indwelling catheter, which resulted in difficulty urinating and in the need for additional treatment necessary to re-catheterize his bladder.

Dr. Hall further asserted that the plaintiff's claimed urinary incontinence was not caused by any alleged deviation from the standard of care. Rather, he explained that urinary incontinence is a known consequence of a radical prostatectomy, and that it occurs because several control mechanisms that allow for urinary flow are removed, specifically, the proximal sphincteric unit and proximal urethral sphincter, which as Dr. Hall explained, are small, circular muscles that prevent urinary leakage. He noted that the plaintiff's loss of the Foley catheter, and the concomitant need for the postoperative placement of a supra-pubic catheter, would be more likely to cause a urinary stricture, or inability to urinate through the urethra, as opposed to urinary incontinence. Despite finding the plaintiff's allegation that he sustained an infection to be "unclear" as to the nature of the infection, Dr. Hall nonetheless asserted that a urinary tract infection is a known risk of a prostatectomy and the placement of a Foley catheter.

Crucially, Dr. Hall asserted that, contrary to the plaintiff's contentions, the "plaintiff's bladder was never perforated." As he explained it, when the first and second attempts to replace the catheter were made, the catheter was "rerouted" through the anastomosis and behind the bladder. According to Dr. Hall, this was not due to a deviation from the standard of care by Dr. John but, rather, due to "the anatomical changes which plaintiff underwent as a result of the surgery."

In opposition to the Sloan Kettering defendants' motion, the plaintiff relied on many of the same documents that those defendants submitted to the court, and submitted an attorney's affirmation, a counter statement of material facts, and the expert affirmation of board-certified

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 13 of 22

13 of 22

[* 13]

urologist Jerry J. Weinberg, M.D., who concluded that Smith and Dalbagni departed from good and accepted practice, and that their departures caused or contributed to the plaintiff's injuries.

Dr. Weinberg first explained that a retropubic radical prostatectomy involves making a three-to-four-inch midline incision above the patient's pubic bone, and thereupon dissecting the entirety of the patient's prostate gland from the bladder neck. As he further explained it, the patient's urethra, which enters the bladder via the prostate, must be cut, and an anastomosis must be created connecting the urethra directly to the bladder itself. He asserted that a Foley catheter is placed in the patient's bladder, allowing urine to drain while the anastomosis heals, holding the urethra open, and preventing multiple significant complications, including urethra and bladder neck narrowing. As Dr. Weinberg described it, the tube portion of a Foley catheter is passed through the urethra and into the bladder via the anastomosis, while fluid is employed to inflate the balloon inside the bladder neck, thus preventing traumatic catheter removal, during which the tube prematurely exits the bladder and passes back through the urethra. Hence, he averred that, before placing the catheter, "the nurse and surgeon must both independently confirm there are no defects that might prevent the balloon from properly deflating or cause it to deflate prematurely." Dr. Weinberg further stated that, once the catheter is in place, the balloon must be inflated to a volume of at least 10 cubic centimeters, and the surgeon must palpate the patient's bladder to ensure that the balloon is properly positioned and inflated, while the rubber tube should then be taped to the patient's thigh or stomach to prevent involuntary movement, inasmuch as excessive movement can cause tension, putting pressure on the balloon, and resulting in premature deflation.

Dr. Weinberg further opined that,

> "[i]f a traumatic removal occurs the Foley catheter must be immediately replaced. If the catheter cannot be replaced through the urethra, the surgeon should revise the anastomosis and surgically replace the Foley catheter. In limited situations inflammation and swelling may complicate surgical revision and replacement and it may be appropriate to temporarily place a suprapubic catheter by way of a small incision between the patient's belly button and pubic bone."

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No. 002

Page 14 of 22

14 of 22

[* 14]

He was of the opinion that a suprapubic catheter is inferior to a Foley catheter because the suprapubic catheter sits outside the urethra, does not hold the urethra open, and is more likely to result in complications, including narrowing of the bladder neck. As Dr. Weinberg characterized it, placement of a suprapubic catheter is a temporary measure, and it should be replaced with a Foley catheter as soon as possible, typically no more than two weeks later.

Dr. Weinberg asserted that replacing a Foley catheter by touch or feel is a delicate procedure. He explained that, in attempting to replace a Foley catheter in this fashion, the catheter should be coiled and the tip lubricated with sterile lubricant jelly, then slowly introduced into the urethra and advanced through both the urethra and anastomosis into the bladder. He asserted that the physician attempting this type of placement must register and respond to pressure and resistance to ensure that the catheter advances properly and does not cause further injury. Dr. Weinberg noted that, if the physician applies too much pressure or fails correctly to interpret sensory feedback, the attempted re-catheterization will fail, and the patient may suffer harm, including damage to the anastomosis.

Dr. Weinberg agreed with Dr. Hall's general descriptions of the types of procedures performed by Drs. John, Smith, and Dalbagni, but asserted that, rather than surgically repairing the damaged anastomosis and replacing the Foley catheter, the Sloan Kettering defendants elected to place a suprapubic catheter, without making a written notation as to why they decided to use that type of catheter. Dr. Weinberg noted that, on December 12, 2018, when Dalbagni again unsuccessfully attempted to replace the Foley catheter, he did not repair the damaged anastomosis stitching, but, instead, permitted an interventional radiologist to place a nephrostomy tube into the bladder to evacuate the urine. He explained that a nephrostomy tube is usually placed directly in the kidneys not through the urethra into the bladder, since, among other things, it is not intended to keep the urethra open in the same manner as a Foley catheter.

Dr. Weinberg opined that the plaintiff's indwelling Foley catheter became dislodged either because the balloon portion of the catheter was not in proper working order, the balloon

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 15 of 22

15 of 22

[* 15]

was underinflated, or the tube portion of the catheter was improperly secured. As he explained it, a properly placed Foley catheter cannot become dislodged in only 15 hours, absent substantial trauma that was not present here. Hence, he concluded that the Sloan Kettering defendants departed from good and accepted standards of medical care by failing to check on the condition and functioning of the balloon component of the initial Foley catheter prior to placement, particularly since he noted that there was no indication, either in the medical records or in the relevant deposition testimony, that any member of the surgical team checked the balloon to confirm it was in working order, that it would properly inflate, and that it would not prematurely deflate. More particularly, Dr. Weinberg asserted that the Sloan Kettering defendants departed from good and accepted standards of medical care by "failing to properly and adequately inflate the Foley catheter's balloon and to ensure the balloon was properly placed within the bladder neck." In this regard, he noted than neither Smith nor Dalbagni ever explained how they determined the amount of fluid needed adequately to inflate the balloon, or how much they actually inflated the balloon.

Dr. Weinberg further asserted that Smith and Dalbagni committed malpractice in failing properly to secure the initially placed Foley catheter, and in failing to ensure that excessive tension was not placed upon that catheter. In this regard, he referred to Smith's deposition testimony as to his custom and practice of taping a Foley catheter to a patient's thigh at the conclusion of a procedure, but noted that Smith did not have a contemporaneous memory of taping the Foley catheter to the plaintiff's thigh, and the absence of any reference to such taping in the relevant operative report.

Dr. Weinberg further opined that these deviations from accepted practice "resulted in the traumatic removal of Mr. Kaplow's Foley catheter," that these defendants "damaged the anastomosis while attempting to replace the Foley catheter," and that "the lack of a Foley catheter and the use of a suprapubic catheter caused and contributed [both] to the narrowing of

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 16 of 22

16 of 22

Mr. Kaplow's bladder neck, which required surgical intervention, as well as [to] his incontinence and other urinary difficulties."

In reply, the Sloan Kettering defendants submitted an attorney's affirmation, in which counsel argued that Dr. Weinberg had proffered opinions as to alleged departures from the standard of care that had not been enumerated in the plaintiff's bill of particulars. Specifically, counsel asserted that Dr. Weinberg's allegations that the Sloan Kettering defendants committed malpractice by failing to check the condition of the balloon component of the Foley catheter preoperatively, failing properly to inflate the balloon and insure the proper placement of the balloon within the bladder neck, failing properly to secure the Foley catheter after its placement, and failing to ensure that there was no excessive tension placed on the catheter, were not asserted in the bills of particulars, but raised for the first time in Dr. Weinberg's affirmation. Counsel thus contended that the plaintiff did not raise a triable issue of fact in opposition to the motion. Counsel further argued that many of the facts alleged by Dr. Weinberg were contradicted by the relevant medical records, and that Dr. Weinberg's affirmation was "internally inconsistent." Moreover, he contended that Dr. Weinberg did not even address several of the departures from good practice that the plaintiff had identified in the bill of particulars.

Although Dalbagni and Smith established their prima facie entitlement to judgment as a matter of law in connection with the medical malpractice cause of action, the court concludes that the plaintiff raised triable issues of fact as to whether those defendants departed from good and accepted practice in failing to check the condition of the balloon component of the Foley catheter preoperatively, failing properly to inflate the balloon and insure the proper placement of the balloon within the bladder neck, failing properly to secure the Foley catheter after its placement, and failing to ensure that excessive tension was not placed on the catheter. The plaintiff also raised a triable issue of fact as to whether those departures caused the plaintiff's injuries and need to undergo additional procedures.

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 17 of 22

17 of 22

While the court recognizes that "a plaintiff cannot raise a new or materially different theory of recovery against a party from those pleaded in the complaint and the bill of particulars for the first time in opposition to a motion for summary judgment" (*Fasce v Catskill Reg. Med. Ctr.*, 209 AD3d 1138, 1139-1140 [3d Dept 2022] [citations and internal quotation marks omitted]; *see Anonymous v Gleason*, 175 AD3d 614, 617 [2d Dept 2019]; *Palka v Village of Ossining*, 120 AD3d 641, 643 [2d Dept 2014]*; Scanlon v Stuyvesant Plaza*, 195 AD2d 854, 855-856 [3d Dept 1993]), the court disagrees with the Sloan Kettering defendants' contention that the alleged departures about which Dr. Weinberg opined were "different" than those identified in the bills of particulars, as they fall within the ambit of negligent insertions and reinsertions of a catheter, and inappropriate postoperative care, which clearly were alleged therein. Hence, that branch of the motion seeking summary judgment dismissing the medical malpractice cause of action, to the extent that they were premised upon those alleged departures, must be denied. Nonetheless, Dalbagni and Smith established their prima facie entitlement to judgment as a matter of law in connection with any claims of malpractice arising from their alleged failure to diagnose the plaintiff's condition, their alleged failure to order or undertake proper testing, their alleged failure timely to recognize that the indwelling Foley catheter had fallen out, their alleged failure properly to instruct other medical personnel as to the proper care of the plaintiff, and their alleged failure to consult with certain specialists. Since Dr. Weinberg did not address those claimed departures, those defendants must be awarded summary judgment dismissing so much of the medical malpractice cause of action as was premised on those alleged departures.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment, but not for negligent treatment provided by an independent physician, as when the physician is retained by the patient himself'" (*Valerio v Liberty Behavioral Mgt. Corp.*, 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp.*, 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care*

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 18 of 22

[* 18]

*Corp.*, 164 AD3d 1211, 1213 [2d Dept 2018]). Generally, however, a hospital is not vicariously liable for the malpractice of a private attending physician who is not its employee (*see Mondello v New York Blood Ctr.-Greater N.Y. Blood Program*, 80 NY2d 219, 228 [1992]; *Fiorentino v Wenger*, 19 NY2d 407, 414 [1967]; *Zhuzhingo v Milligan*, 121 AD3d 1103, 1106 [2d Dept 2014]). The Sloan Kettering defendants conceded that Dalbagni and Smith were employees of Memorial Hospital for Cancer and Allied Diseases, sued herein, and popularly known, as Memorial Sloan Kettering Cancer Center. Hence, to the extent that there are triable issues of fact as to those individuals' malpractice, there exist triable issues of fact as to whether the hospital is vicariously liable therefor. The court notes that the plaintiff made no allegations of independent malpractice against any other Sloan Kettering employee, including Dr. John.

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d 619, 620 [3d Dept 1999], quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Nonetheless, "expert testimony concerning what a reasonable person would have done in plaintiff's position is not necessary to maintain a cause of action premised

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 19 of 22

19 of 22

upon lack of informed consent" (*Gray v Williams*, 108 AD3d 1085, 1087 [4th Dept 2013]; *see Hugh v Ofodile*, 87 AD3d 508, 509 [1st Dept 2011]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000]).

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nonetheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with such a claim where a patient signs a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

"A failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456). In addition to invasive diagnostic testing arising from a failure properly to diagnose a medical condition, the administration of nonindicated medications arising from a misdiagnosis may also be the basis for a lack of informed consent cause of action (*see Lyons v Vassar Bros. Hosp.*, 30 AD3d 477, 478 [2d Dept 2006]). Here, however, the allegations of lack of informed consent were not related to the allegations of any failure to diagnose, but, rather, were related directly to invasive procedures, namely, the insertion and attempted reinsertions of a Foley catheter.

According to Dr. Hall, Smith's chart indicated that Smith had informed the plaintiff of the risks of the prostatectomy procedure, which necessarily required the placement of a Foley catheter, and that those risks included infection, urinary leakage, bleeding, lymphocele, positional injuries, deep venous thrombosis, pulmonary emboli, bowel injury, rectal injury,

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No.  002

Page 20 of 22

ureteral injury, cardiac or respiratory problems, penile shortening, urethral strictures, incontinence, and impotence. He further asserted that the plaintiff appropriately consented to the initial procedure and subsequent cystoscopies notwithstanding his knowledge of the risks, benefits, and alternatives. Additionally, Dr. Hall asserted that the standard of care permitted Dr. John, the Sloan Kettering urology fellow, to attempt to replace the Foley catheter at the plaintiff's bedside, without obtaining an additional consent, inasmuch as written consent is not needed for the insertion of a Foley catheter, and the Sloan Kettering defendants already had obtained the plaintiff's fully informed consent to the underlying radical prostatectomy "which, by its very nature, required the placement of the Foley catheter." Inasmuch as Dr. Weinberg did not address the issue of consent in his affirmation, the plaintiff failed to raise a triable issue of fact in opposition to the Sloan Kettering defendants' prima facie showing with respect to that cause of action. Hence, summary judgment must be awarded to the Sloan Kettering defendants dismissing the lack of informed consent cause of action insofar as asserted against them.

A cause of action premised upon negligent hiring must be supported by proof that the defendants either "knew, or should have known," of their employees' "propensity for the sort of conduct which caused the injury" (*Sheila C. v Povich*, 11 AD3d 120, 129-130 [1st Dept 2004]; *see Kuhfeldt v New York Presbyt./Weill Cornell Med. Ctr.*, 205 AD3d 480, 481-482 [1st Dept 2022]). The court notes that, in his complaint, the plaintiff did not explicitly state a cause of action to recover for negligent hiring, supervision, training, and retention, but, instead, asserted that claim only in his bills of particulars. Even if the court were to deem those allegations to constitute a cause of action, it concludes that the Sloan Kettering defendants made a prima facie showing of entitlement to judgment as a matter of law with respect thereto, that the plaintiff's failure to address the issue in his opposition papers requires the court to conclude that he failed to raise a triable issue of fact, and that those defendants thus are entitled to summary judgment dismissing that claim insofar as asserted against them.

In light of the foregoing, it is,

805183/2019   KAPLOW, JAMES R vs. DALBAGNI MD, GUIDO
Motion No. 002

Page 21 of 22

21 of 22

ORDERED that the motion of the defendants Guido Dalbagni, M.D., Robert C. Smith, M.D., and Memorial Sloan Kettering Cancer Center is granted to the extent that they are awarded summary judgment dismissing, insofar as asserted against them, (1) the lack of informed consent cause of action, (2) so much of the medical malpractice cause of action was premised upon their alleged failure to diagnose the plaintiff's condition, their alleged failure to order or undertake proper testing, their alleged failure timely to recognize that an indwelling Foley catheter that they had placed had fallen out, their alleged failure properly to instruct other medical personnel as to the proper care of the plaintiff, and their alleged failure to consult with certain specialists, and (3) the plaintiff's claim, set forth in his bills of particulars, that they were liable for negligent hiring, training, supervision, and retention, that cause of action and those claims are dismissed insofar as asserted against the defendants Guido Dalbagni, M.D., Robert C. Smith, M.D., and Memorial Sloan Kettering Cancer Center, and the motion is otherwise denied; and it is further,

ORDERED that that the attorneys for all of the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on January 22, 2025, at 12:00 noon, at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

| **12/19/2024** | | | | | | |
|---|---|---|---|---|---|---|
| **DATE** | | | | | **JOHN J. KELLEY, J.S.C.** | |
| CHECK ONE: | | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
| | | GRANTED | DENIED | X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |